**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| LEO FELER, <br><br> *Plaintiff*, <br><br> v. <br><br> UNITED STATES OF AMERICA; and JOHN DOES, Unknown Customs and Border Protection Officers sued in their individual capacities, <br><br> *Defendants*. | Case No. <u>1:26-cv-8915</u> <br><br><br> **COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES** <br><br> **JURY TRIAL DEMANDED** |

### INTRODUCTION

1.      This is a civil-rights case arising from a warrantless raid of an innocent man's property. Just before noon on October 24, 2025, several unmarked cars filled with Customs and Border Protection ("CBP") officers sped the wrong way down a one-way, residential street in Chicago's Lakeview neighborhood. After spotting a construction crew, the cars abruptly stopped outside of Plaintiff Leo Feler's home. Masked, heavily armed CBP officers jumped out of the vehicles and began chasing four construction workers who were renovating Feler's house.

2.      The four workers were subcontractors for a reputable contractor that Feler hired to repair the siding and windows of his three-unit building, where he lives alongside his family and his tenants. Three of the workers were standing on the sidewalk just beyond Feler's front gate, and a fourth was sitting inside the fence on Feler's front stoop. All were peacefully eating lunch when the CBP agents initiated the raid. When the workers saw the vehicles rushing toward them at high speed, they panicked. Two of the workers who had been eating on the sidewalk rushed inside

1

Feler's fenced-in front yard and closed the gate behind them, and the third ran down the public sidewalk away from the officers.

3. Undeterred, several CBP agents scaled Feler's fence and began chasing the three remaining workers through Feler's property. Two of the workers managed to enter Feler's home, where they were no longer pursued. One of these workers was forced to climb through a second-story window while CBP agents scaled Feler's fence, attempted to grab him, and threatened him with pepper spray. The third worker—the one who had been eating lunch on Feler's front stoop when the CBP agents arrived—was not so lucky. The CBP agents chased him into Feler's detached garage, where he was threatened and, ultimately, arrested.

4. Feler did not want the CBP officers on his property. But because he was not home at the time, he was forced to watch the raid in real time through his home-security cameras. And although he used the cameras' built-in microphones to tell the agents to leave, they ignored him. The agents similarly ignored one of Feler's tenants—the only resident at home during the raid— who repeatedly ordered the officers to leave and demanded to see a warrant.

5. Once the agents apprehended the worker in Feler's garage, they attempted to break the lock on Feler's front gate to leave. Feler's tenant eventually unlocked the gate when it appeared that the agents planned to throw the detained worker over Feler's spiked fence. By then, a crowd of concerned neighbors had gathered in the street. The neighbors told the CBP agents that they were not welcome and demanded the release of the detained worker. Although the neighbors were not blocking the CBP agents from leaving, the agents elected to deploy tear gas in front of their vehicles as they backed away down the one-way street. The wind carried the tear gas back toward the officers' vehicles, and it eventually wafted over a playground about a block and a half away.

6. After the raid, the United States admitted that the CBP officers did not have a warrant. Nor did they have any reason to believe that any criminal activity was happening on or near Feler's property. Still, they decided to launch a dangerous and unnecessary raid that damaged Feler's possessions and undermined his sense of security in his home. Feler delayed the renovations on his home for months after the raid, fearing that hiring other workers could subject him to similar warrantless raids.

7. Feler does not want his property to be invaded by masked federal agents chasing individuals who are not reasonably suspected of committing any crimes. He wants those he invites onto his property to feel safe, just as he wants to feel safe on his own property. So he brings this case seeking accountability for the injustices he suffered. This complaint lays out several pathways for relief against the individual officers who raided Feler's property and against the United States, their employer.

8. For the federal constitutional violations and torts he suffered, Feler asserts the following claims against the individual CBP officers who entered his property without a warrant:

   a. A claim directly under the Constitution for the violation of Feler's Fourth Amendment rights by officers acting under color of federal law (Count IV). *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

   b. A claim under the Westfall Act, 28 U.S.C. § 2679(b)(2)(A), which codified *Bivens* as it existed in 1988, for the violation of Feler's Fourth Amendment rights by officers acting under color of federal law (Count V).

3

    c.    State-law claims for torts committed by officers wielding federal authority (Counts VI through VIII). These claims proceed under two different theories:

    i.    First, these claims are allowed by the Westfall Act because the Act's exclusive-remedy provision does not apply to any claim "which is brought for a violation of the Constitution of the United States," 28 U.S.C. § 2679(b)(2)(A), and Feler's state tort claims seek to remedy constitutional violations.

    ii.    Second, if the Westfall Act precludes these claims (and no other relief is available in this case), then the Act is unconstitutional as applied to Feler; its exclusive remedy provision, 28 U.S.C. § 2679(b)(1), cannot bar his state tort claims against the individual officers.

9.    Feler also asserts claims against the United States under the Federal Tort Claims Act for the wrongful acts of the CBP officers who searched his property without a warrant (Counts I through III). As discussed below, Feler has exhausted his administrative remedies under the FTCA.

10.    Feler brings this set of claims because, at bottom, there must be *some* remedy for people whose fundamental property rights are violated by federal agents showing a callous disregard for the Constitution. As Justice Kavanaugh recently observed, "the Fourth Amendment prohibits such action" by law-enforcement officers, and "remedies should be available in federal

court." *Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 5 (2025) (Kavanaugh, J., concurring). Whatever path the Court ultimately selects, Feler is entitled to judgment in his favor.

## JURISDICTION AND VENUE

11. Plaintiff Leo Feler brings this case under the Fourth Amendment to the Constitution of the United States; the Federal Tort Claims Act and the Westfall Act of 1988, 28 U.S.C. §§ 1346, 2674 *et seq.*; and Illinois law.

12. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367 because Feler asserts claims under federal law, and his state-law claims—which seek to remedy constitutional violations—arise from the same underlying events.

13. Venue is proper under 28 U.S.C. §§ 93(a)(1) and 1391(b)(2) because the events giving rise to this action occurred in Cook County, Illinois.

## PARTIES

14. Plaintiff Leo Feler is a citizen of the United States.

15. When the events giving rise to this action occurred, Feler resided in Chicago, Illinois, where he continues to reside.

16. Defendant United States of America is the federal government of the United States.

17. Defendants named as DOES (the "John Doe Defendants"), are unknown officers of United States Customs and Border Protection. Each John Doe Defendant is—or, at least, was when the events giving rise to this action occurred—an employee of the United States Government. They are sued in their individual capacities.

18. The John Doe Defendants are the CBP officers who entered Feler's property without a warrant on October 24, 2025. They were accompanied by other federal officers who did not enter Feler's property that day, but Feler sues only the officers who did enter his property.

19. During the underlying events of this lawsuit, the John Doe Defendants subjected Feler, or caused him to be subjected, to the deprivation of his constitutional rights and his rights under Illinois law.

20. At all relevant times, the John Doe Defendants were acting within the scope of their federal employment.

21. Feler attempted to identify the John Doe Defendants by filing a police report with a local police department after the raid.

22. Feler attempted to identify the John Doe Defendants by reviewing the footage captured by his home-security cameras on the day of the raid.

23. Feler attempted to identify the John Doe Defendants by reviewing the filings in a habeas case involving the worker who was arrested at his house during the raid.

24. Feler's counsel attempted to identify the John Doe Defendants by submitting a Freedom of Information request to CBP on July 16, 2026.

25. Despite these efforts, Feler has been unable to learn the identities of the John Doe Defendants.

26. As a result, Feler is suing the John Doe Defendants by their fictitious names and will amend his complaint to name the officers who entered his property on October 24, 2025, when those names become known to him.

### FACTUAL ALLEGATIONS

**A.    *Feler's property includes a private, enclosed backyard and a detached garage.***

27.    Plaintiff Leo Feler owns a three-unit residential building on North Lakewood Avenue in Chicago, Illinois.

28.    Feler and his family reside in one of the units in his building. Feler generally rents the remaining two units to tenants.

29.    North Lakewood Avenue is a quiet, residential one-way street; traffic may only lawfully proceed north-to-south.

30.    Feler's property contains a small front yard to the west of his house and a larger backyard to the east of his house.

31.    Below is an aerial photograph of Feler's property:



32.    Feler's western fence, which encloses his front yard, is made of spiked metal posts. It has two gates, with deadbolt locks, that allow individuals with the codes to the locks to enter the property.

33.    Below is a photograph of the front of Feler's house (with the address number obscured), including one of the gates in his front fence (which is open in the photograph):

7



34. Below is a photograph of Feler's house while it was under construction in 2025 (with the address number obscured):



35. Feler's house is flanked to the north and south by other homes. The house to the north is approximately 3 feet away from the northern edge of Feler's home; the house to the south is approximately 10 feet away from the southern edge of Feler's home.

36. The space between Feler's house and the house to its north is too small to reasonably accommodate a fence. That said, the northern boundary of Feler's property is demarcated with a tall, wooden privacy fence that begins where the neighbor's home ends. It extends to Feler's garage on the eastern border of his property.

37. The southern boundary of Feler's property is demarcated with a tall, wooden privacy fence that extends to the eastern edge of Feler's backyard. It also extends through the space between Feler's house and the house to its south.

38. On the eastern boundary of Feler's property sits his garage. The garage takes up the entire eastern border of the property; there is no gap through which a person could exit Feler's backyard if the garage is closed.

39. This means Feler's backyard is completely enclosed. It is flanked by the house to the west, by fences to the north and south, and by Feler's garage to the east.

40. Below is a photograph of Feler's backyard taken from his home, looking east toward his garage:



41.     Due to the fencing and the garage, a person standing on any public road cannot see into Feler's backyard.

42.     Feler's backyard cannot be accessed unless a person enters through one of the front gates and walks along the side of the house, walks through the house itself, or walks through the garage.

43.     On the east side of Feler's home (facing his backyard), he has a second-story balcony.

44.     Below is a photograph of Feler's balcony, taken from his backyard:



45.     If Feler's gates and garage are closed, there is no lawful way for a person to enter his backyard.

46.     Even if a gate or the garage is open, Feler does not allow strangers to enter his backyard without his permission, his family's permission, or his tenants' permission.

47.     Feler, his family, and his tenants use Feler's backyard for domestic activities like grilling, eating meals, entertaining guests, reading, and relaxing.

48.     Feler maintains a sense of privacy and security in his secluded backyard.

49.     Feler's backyard is a part of his home's curtilage for Fourth Amendment purposes.

50.     Feler, his family, and his tenants use Feler's detached garage for domestic activities like storing personal possessions and entertaining guests during parties.

51.     Feler maintains a sense of privacy and security in his garage.

52.     Feler's garage is part of his home's curtilage for Fourth Amendment purposes.

11

53. Feler's front yard is also enclosed because it is bounded by his spiked metal fence, and it immediately adjoins his home and his home's front stoop.

54. Feler, his family, and his tenants use the front yard, front stoop, and second-story balcony for domestic activities like gardening, reading, and relaxing.

55. Feler's enclosed front yard, front stoop, and second-story balcony are part of his home's curtilage for Fourth Amendment purposes.

**B.** ***Without a warrant or any suspicion of criminal activity, CBP officers raid Feler's property.***

56. In the fall of 2025, Feler hired a reputable contractor to replace the windows and siding on his home.

57. After Feler hired the contractor, the contractor in turn subcontracted four construction workers to complete the renovations Feler requested.

58. Feler did not hire the construction workers directly, and he did not know them before the contractor hired them to complete the renovations.

59. On October 24, 2025, Feler was in Canada for work.

60. While Feler was out of town, he had given the four construction workers permission to enter his property—including his front porch, his front yard, his backyard, his garage, and his home—to complete the renovations.

61. Just before noon on October 24, 2025, the four construction workers were peacefully eating lunch as they took a break from working on Feler's home.

62. Three of the workers were eating on the sidewalk just outside Feler's front gate; the fourth was eating within Feler's fence on his front stoop.

12

63. Suddenly, two unmarked cars full of CBP officers began speeding north (the wrong way) on the one-way North Lakewood Avenue toward Feler's house.

64. Once the three workers saw the vehicles speeding toward the house, coming the wrong way on the one-way residential street, the workers panicked.

65. The CBP vehicles came to a sudden stop right in front of Feler's house.

66. As soon as the vehicles stopped, several masked, armed CBP officers jumped out of the vehicles and began running toward the three workers who were standing beyond Feler's front gate.

67. Upon information and belief, the workers had no idea who the masked men were.

68. One worker began to run north along the sidewalk of North Lakewood Avenue. CBP officers did not pursue him.

69. The other two workers who had been eating lunch just outside Feler's front gate ran into Feler's fenced front yard and closed the gate behind them.

70. At least three CBP officers—the John Doe Defendants—pursued the three workers who remained on Feler's property.

71. The John Doe Defendants began by attempting to force Feler's front gate open.

72. Unable to force the gate open, the John Doe Defendants scaled the fence surrounding Feler's front yard and began chasing the workers through Feler's property.

73. The John Doe Defendants damaged Feler's front-yard fence in the process of scaling it to pursue the workers.

74. As the John Doe Defendants pursued the workers through Feler's property, they walked on top of construction equipment that was staged outdoors, damaging it.

75.     The first worker was able to enter Feler's house through a back door, and he was no longer pursued once inside.

76.     The second worker also attempted to enter Feler's house through a back door, but he was unable to do so. He then climbed on to Feler's second-story balcony using a ladder that was propped against the balcony.

77.     To pursue the second worker, John Doe Defendant 1 climbed onto Feler's second-story balcony.

78.     To access Feler's second-story balcony, John Doe Defendant 1 climbed up Feler's external air conditioning unit, damaging the air conditioning unit and the second-story balcony.

79.     While John Doe Defendant 1 grabbed the second worker's clothing to detain him on the balcony, John Doe Defendant 2 scaled Feler's southern fence to assist with the arrest, damaging the fence.

80.     John Doe Defendant 1 held onto the second worker as the worker straddled Feler's southern fence and his second-story balcony, while John Doe Defendant 2 sat on Feler's fence next to the worker's foot. As seen on security-camera footage, John Doe Defendant 1 and John Doe Defendant 2 threatened: "We're going to [pepper] spray you together at the same time!"

81.     John Doe Defendant 1 then pulled the second worker back onto the second-story balcony, and John Doe Defendant 2 followed them by swinging from Feler's fence onto the balcony, further damaging the fence.

82.     Despite being on the small balcony with the two officers, the second worker was able to enter Feler's house through a second-story window. Once he was inside, the agents stopped pursuing him.

14

83. One of the workers who made it inside Feler's house had sustained a severe cut during the raid.

84. The worker's injuries left puddles of blood in Feler's home.

85. The third worker ran inside Feler's garage on the eastern edge of Feler's property.

86. John Doe Defendant 3 pursued the third worker into Feler's garage, damaging construction materials stored inside it.

87. Security-camera footage shows the third worker telling John Doe Defendant 3 that he did not have authority to enter Feler's garage. The worker repeatedly tells John Doe Defendant 3 that his entry is "prohibido."

88. In response, John Doe Defendant 3 yelled: "I will fucking [pepper] spray you right now. You want sprayed? You want fucking sprayed?"

89. The worker submitted to arrest inside Feler's garage.

90. John Doe Defendant 3 arrested the third worker inside Feler's garage and marched him back to Feler's front fence, where he joined the other John Doe Defendants.

91. By the time the John Doe Defendants reached Feler's front gate with the worker detained, a crowd of concerned neighbors had gathered in the street.

92. The neighbors voiced their opposition to the raid as the John Doe Defendants tried to figure out how to get the worker past Feler's still-locked gates.

93. The John Doe Defendants attempted to break the lock on one of Feler's front gates, but they failed, managing only to damage it.

94. When it seemed as though the John Doe Defendants were planning to throw the worker over Feler's spiked fence, one of Feler's tenants (the only one who had been at home during the raid) unlocked the gate for them.

95. The John Doe Defendants forced the detained worker into one of their vans as the neighbors continued to voice their opposition.

96. None of the neighbors attempted to prevent the agents from driving away.

97. Still, even though the CBP agents had a clear path of egress (which they elected to use by driving in reverse down North Lakewood Avenue), they deployed tear gas in front of their vehicles.

98. Body camera footage from the raid shows one CBP agent (who was driving a vehicle, and who may be a John Doe Defendant) urging another CBP agent to throw the tear gas "for fun."

99. The wind carried the tear gas back toward the agents, who temporarily abandoned their vehicles but left the detained worker trapped and handcuffed in the chemical fog.

100. The wind then blew the tear gas through Feler's residential neighborhood and over a playground about a block and a half away.

101. Throughout the raid, Feler's tenant repeatedly demanded that the John Doe Defendants show her a warrant.

102. The John Doe Defendants never showed Feler's tenant a warrant.

103. Throughout the raid, Feler's tenant repeatedly told the John Doe Defendants that they had no authority to enter Feler's property and demanded that they leave.

104. The John Doe Defendants ignored her.

105. Feler's tenant never gave the John Doe Defendants permission to enter Feler's property.

106. Because Feler was not at home during the raid, he was forced to watch the events underlying this lawsuit unfold through his home-security cameras.

107. Feler became aware of the raid right as it began because one of the workers rang his Ring doorbell before fleeing to the back of his house.

108. Feler watched, powerless, as the agents invaded his private property, damaged his belongings, and chased after the workers.

109. At one point, Feler used his cameras' built-in microphones to tell the John Doe Defendants that they were trespassing on his property and to demand that they leave.

110. Security-camera footage shows that at least one John Doe Defendant heard Feler's voice. Neither he nor any other John Doe Defendant followed Feler's instructions to leave.

111. Feler never gave the John Doe Defendants permission to enter Feler's property.

112. No other individual with lawful authority to do so gave the John Doe Defendants permission to enter Feler's property.

**C.** ***The United States admits that the CBP officers had no warrant.***

113. In later court proceedings regarding the detained worker, the United States admitted that he had been arrested without a warrant.

114. Upon information and belief, Defendants did not have an arrest warrant for *any* of the four workers at Feler's property on October 24, 2025.

115.    Upon information and belief, the CBP officers did not even know the names or identities of any of the four workers subcontracted to renovate Feler's property before the raid on October 24, 2025.

116.    Defendants did not have a search warrant for Feler's property on October 24, 2025.

117.    Defendants did not have consent to enter Feler's property on October 24, 2025.

118.    Upon information and belief, Defendants did not have reasonable suspicion to question any of the workers hired to renovate Feler's property on October 24, 2025.

119.    Upon information and belief, none of the workers hired to renovate Feler's property on October 24, 2025, was engaged in criminal activity, and none was wanted for a crime.

120.    Upon information and belief, the CBP officers had no reason to believe that *any* criminal activity was taking place on or near Feler's property on October 24, 2025.

121.    Upon information and belief, the CBP officers began driving the wrong way down North Lakewood Avenue simply because they saw a group of construction workers eating lunch at Feler's property.

122.    Upon information and belief, the CBP officers targeted Feler's property based on nothing more than the workers' race and their employment as construction workers.

**D.    *Feler rushes home to deal with the aftermath of the raid.***

123.    As soon as the raid ended, Feler abandoned his ongoing work meetings in Canada and booked the first flight back to Chicago. He also canceled his plans to run a marathon after the meetings concluded.

124.    When Feler returned to his home, he found it in disarray. His western and southern fences were damaged, the lock on one of his front gates was broken, his construction materials were

trampled, his air conditioner was damaged, and there were puddles of blood from a worker's injuries throughout his house.

125.    Feler cleaned up the injured worker's blood himself.

126.    Everyone who lived at Feler's house was deeply affected by the raid. Feler and his family felt equal parts guilty and outraged. Guilty because they were not at home to prevent the warrantless invasion from taking place; outraged because the John Doe Defendants trespassed to apprehend peaceful workers whom Feler had given permission to be on his property. The tenant who had been home during the raid moved back in with her parents and requested to terminate her lease early because she no longer felt safe at the house (though she ultimately decided to return).

127.    After the raid, Feler felt extremely nervous about hiring any other workers to complete the half-finished renovations. He worried that hiring additional workers would lead to more warrantless raids at his property.

128.    As a result, Feler stopped the renovations on his property for months. He took time off from his full-time job and performed some of the most necessary renovations himself to prepare the house for inclement weather.

129.    When Feler finally felt secure enough to resume the renovations on his home months later, he ensured that no work was done while he was not present. He worried that his absence might allow another raid to take place at his property without a warrant or his consent.

130.    Feler also developed a general anxiety about being away from home. He canceled work-related travel and his plans to spend Thanksgiving with family out of town, fearing that something bad would happen if he left his house for an extended period.

131. Feler has tried to seek accountability for the raid since it occurred. He spoke to members of the media about what happened at his property, and he tried to file a police report with two local police offices, hoping that local officers would investigate, identify the John Doe Defendants, and hold them accountable.

132. Neither strategy worked. The first local police office Feler visited refused to file a police report, and while the second office did file a police report, a sergeant later called to inform Feler that the department would not investigate the raid.

133. Feler's media efforts, meanwhile, only made things more complicated.

134. Feler—an accomplished economist and former professor—was forced to leave his lucrative private-sector job because his employer did not want him to speak out against the raid publicly or say anything that could be interpreted as uncomfortable for clients, fearing that criticism would lead to retaliation.

**E.** ***Feler submits administrative claims to the federal government.***

135. Without any other viable option for accountability, Feler prepared to file this lawsuit.

136. He began by exhausting his administrative remedies under the Federal Tort Claims Act. Because Feler was not certain which federal agency Defendants worked for, he submitted SF-95 forms to Customs and Border Protection, Immigration and Customs Enforcement, and the Department of Homeland Security on December 20, 2025.

137. In January 2026, Feler received an email from Immigration and Customs Enforcement asking him for more documentation. Feler sent the requested documents.

138. On or about February 2, 2026, Feler received a letter from Immigration and Customs Enforcement informing Feler that his claim involved employees of Customs and Border Protection. The letter purported to transfer Feler's claims and all associated documents to CBP. This was the last correspondence sent to Feler from Immigration and Customs Enforcement.

139. Feler had already submitted a claim to CBP in December 2025.

140. As of June 22, 2026 (six months after Feler submitted his administrative claims), he had not received any response from Customs and Border Protection or the Department of Homeland Security.

141. As of the filing of this Complaint, Feler has still not received any correspondence from CBP regarding his administrative claim. He therefore considers the claim constructively denied. *See* 28 U.S.C. § 2675(a).

### Injury to Plaintiff

142. Feler suffered deprivations of his Fourth Amendment rights to be secure in his house, papers, and effects.

143. When the John Doe Defendants chased the workers through Feler's property, they invaded that property without Feler's consent.

144. When the John Doe Defendants chased the workers through Feler's property, they damaged Feler's possessions, including:

      i.    The fence that encloses his front yard;

      ii.    The fence that encloses his side yard;

      iii.    The lock on his front gate;

      iv.    His second-story balcony;

21

    v.      The external air-conditioning unit in his backyard;

    vi.     The construction materials staged outside his house; and

    vii.    The construction materials stored in his garage.

145. Several of these possessions were irrevocably broken by the John Doe Defendants; others required repair.

146. Feler spent time and other resources cleaning up the mess the John Doe Defendants left behind—including the puddles of an injured worker's blood that Feler cleaned up himself.

147. Feler was traumatized by watching the raid through his home-security cameras, unable to prevent the officers from trespassing on his property or apprehending the detained worker.

148. Feler canceled his Thanksgiving travel plans as a result of the raid because he was too distressed to leave his home unattended while he was out of town.

149. Since the raid, Feler has lived in fear that federal immigration officers will return to his home and raid it without a warrant if he hires any other workers to complete renovations.

150. Because of this fear, Feler was forced to delay the renovations on his home for months after the John Doe Defendants invaded his property.

151. Because of this fear, Feler no longer allows any construction workers (or other day laborers) to work on his house while he is away from home.

152. Feler has been outspoken about the raid since it occurred, but his employer did not want him to speak publicly about immigration or any other matters that could be potentially controversial in the aftermath of the raid.

22

153. As a result, Feler was forced to leave his lucrative job to ensure that he could continue to seek accountability.

154. As a result of the raid, Feler has experienced severe emotional distress. He has had difficulty sleeping and controlling his nerves, and he has been prescribed medication to help him sleep through the night. Still, the medication has not been wholly effective. Feler has incurred medical bills from seeking treatment.

155. As a result of the raid, Feler has suffered recurrent intrusive memories of the incident, recurrent nightmares, physiological distress at the sight of vehicles in his neighborhood that look similar to those driven by the CBP agents on the day of the raid, significant alterations to mood, hypervigilance, problems with concentration, and sleep disturbances.

## CLAIMS FOR RELIEF

156. Feler first asserts claims against the United States under the Federal Tort Claims Act for the tortious conduct of its officers (Counts I through III). He then asserts claims against the individual officers, each of which seeks to remedy the violation of his Fourth Amendment rights (Counts IV through VIII).

### Count I: Federal Tort Claims Act
### Trespass
### *Against Defendant United States of America*

157. Feler realleges and incorporates the allegations in ¶¶ 1–155 of this complaint as if they are fully restated here.

158. In Illinois, "[a] trespass is an invasion in the exclusive possession and physical condition of land." *Millers Mut. Ins. Ass'n of Ill. v. Graham Oil Co.*, 668 N.E.2d 223, 230 (Ill. App. Ct. 1996).

159. On October 24, 2025, the John Doe Defendant officers unlawfully raided Feler's property to apprehend the construction workers renovating Feler's house, thereby interfering with Feler's exclusive possession of his property.

160. The October 24, 2025 raid was unlawful because it was conducted without a warrant, without Feler's consent, and without any applicable exception to the Fourth Amendment's warrant requirement.

161. As a direct result, Feler suffered the injuries listed above.

162. The John Doe Defendant officers lacked probable cause to believe that any crime was being committed on or near Feler's property.

163. A private person would be liable to Feler under like circumstances for trespass under the laws of Illinois.

164. Because the John Doe Defendants were acting within the scope of their federal employment, the United States is liable for their tortious actions under the Federal Tort Claims Act.

**Count II: Federal Tort Claims Act**
**Trespass to Chattels**
*Against Defendant United States of America*

165. Feler realleges and incorporates the allegations in ¶¶ 1–155 of this complaint as if they are fully restated here.

166. In Illinois, "[a] trespass to a chattel may be committed by intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another." *Sotelo v. DirectRevenue, LLC*, 384 F. Supp. 2d 1219, 1229 (N.D. Ill. 2005) (citation omitted).

24

167. During the unlawful search of Feler's protected curtilage on October 24, 2025, the John Doe Defendant officers unlawfully damaged Feler's property.

168. The October 24, 2025 raid was unlawful because it was conducted without a warrant, without Feler's consent, and without any applicable exception to the Fourth Amendment's warrant requirement.

169. As a direct result, Feler suffered the injuries listed above.

170. A private person would be liable to Feler under like circumstances for trespass to chattels under the laws of Illinois.

171. Because the John Doe Defendants were acting within the scope of their federal employment, the United States is liable for their tortious actions under the Federal Tort Claims Act.

**Count III: Federal Tort Claims Act**
**Negligence**
*Against Defendant United States of America*

172. Feler realleges and incorporates the allegations in ¶¶ 1–155 of this complaint as if they are fully restated here.

173. In Illinois, "[t]he elements of a negligence cause of action are a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by the breach." *Johnson v. Armstrong*, 211 N.E.3d 355, 371 (Ill. 2022) (citation omitted).

174. The John Doe Defendant officers owed a duty to Feler to exercise reasonable care in ensuring that they would not errantly cause Feler's property to be searched and damaged as part of a warrantless law-enforcement raid conducted without probable cause.

175. The John Doe Defendant officers breached this duty by failing to take even basic steps to ensure that they would not search or damage Feler's property in an attempt to apprehend third parties who were not reasonably suspected of committing any crime.

176. As a direct result, Feler suffered the injuries listed above.

177. A private person would be liable to Feler under like circumstances for negligence under the laws of Illinois.

178. Because the John Doe Defendants were acting within the scope of their federal employment, the United States is liable for their negligent actions under the Federal Tort Claims Act.

**Count IV: United States Constitution**
**Fourth Amendment**
*Against John Doe Defendants*

179. Feler realleges and incorporates the allegations in ¶¶ 1–155 of this complaint as if they are fully restated here.

180. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

181. The Fourth Amendment protects against a warrantless entry into a home—including the curtilage associated with that home—without either an exigency justifying entry or consent to enter.

182. On October 24, 2025, the John Doe Defendants entered Feler's protected curtilage without a warrant to apprehend the workers who were renovating Feler's home.

183. The John Doe Defendants caused damage to Feler's possessions when they chased the workers through his curtilage.

184.    No exigency justified the John Doe Defendants' warrantless entry.

185.    Neither Feler nor anyone else with lawful authority to do so consented to the John Doe Defendants' warrantless entry.

186.    By raiding, searching, and damaging Feler's property without a warrant, an exception to the warrant requirement, or Feler's consent, the John Doe Defendant officers violated the Fourth Amendment's command.

187.    As a direct result, Feler suffered the injuries listed above.

188.    The John Doe Defendants were rank-and-file federal law-enforcement officers.

189.    Like the agents in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), the John Doe Defendants conducted a warrantless entry and search of a home's protected areas in a domestic law-enforcement operation.

190.    The John Doe Defendants were not securing the international border, conducting border-patrol activities at or near the border, or addressing any risk to national security when they entered Feler's property in a residential Chicago neighborhood.

191.    Feler—the owner of the searched property—was not the target of any enforcement action, is not a party to any immigration proceeding arising from the raid, and has no alternative remedial scheme available to compensate him for the invasion of his property.

192.    When the John Doe Defendants raided Feler's property, they acted under color of federal law.

193.    Because they acted with federal authority, the John Doe Defendants are liable directly under the Fourth Amendment for their violations of Feler's Fourth Amendment rights. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

27

### Count V: Westfall Act and the United States Constitution
### Fourth Amendment
#### *Against John Doe Defendants*

194.    Feler realleges and incorporates the allegations in ¶¶ 1–155 of this complaint as if they are fully restated here.

195.    The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

196.    The Fourth Amendment protects against a warrantless entry into a home—including the curtilage associated with that home—without either an exigency justifying entry or consent to enter.

197.    On October 24, 2025, the John Doe Defendants entered Feler's protected curtilage without a warrant to apprehend the workers who were renovating Feler's home.

198.    The John Doe Defendants caused damage to Feler's possessions when they chased the workers through his curtilage.

199.    No exigency justified the John Doe Defendants' warrantless entry.

200.    Neither Feler nor anyone else with lawful authority to do so consented to the John Doe Defendants' warrantless entry.

201.    By raiding, searching, and damaging Feler's property without a warrant, an exception to the warrant requirement, or Feler's consent, the John Doe Defendant officers violated the Fourth Amendment's command.

202.    As a direct result, Feler suffered the injuries listed above.

203.    When the John Doe Defendant officers raided Feler's property, they did so under color of federal law.

28

204. When Congress enacted the Westfall Act in 1988, it codified a damages right of action against federal officers for violations of the U.S. Constitution. *See* 28 U.S.C. § 2679(b)(2)(A); *Hernandez v. Mesa*, 589 U.S. 93, 111 n.9 (2020).

205. Indeed, in 1988, *Bivens* claims were generally available for violations of Fourth Amendment rights by federal officers. *See, e.g.*, *Askew v. Bloemker*, 548 F.2d 673, 680 (7th Cir. 1976) (reversing summary judgment for federal agents on *Bivens* claims arising from a warrantless raid of an innocent family's home).

206. The John Doe Defendants are therefore liable to Feler under 28 U.S.C. § 2679(b)(2)(A) for their violations of his Fourth Amendment rights.

## Count VI: Westfall Act and Illinois Tort Law
### Trespass
### *Against John Doe Defendants*

207. Feler realleges and incorporates the allegations in ¶¶ 1–155 of this complaint as if they are fully restated here.

208. In Illinois, "[a] trespass is an invasion in the exclusive possession and physical condition of land." *Millers Mut. Ins. Ass'n of Ill. v. Graham Oil Co.*, 668 N.E.2d 223, 230 (Ill. App. Ct. 1996).

209. On October 24, 2025, the John Doe Defendant officers unlawfully raided Feler's property to apprehend third parties, thereby interfering with Feler's exclusive possession of his property.

210. The October 24, 2025 raid was unlawful because it was conducted without a warrant, without Feler's consent, and without any applicable exception to the Fourth Amendment's warrant requirement.

211. As a direct result, Feler suffered the injuries listed above.

212. The tortious conduct of the John Doe Defendants also violated Feler's Fourth Amendment rights.

213. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

214. The Fourth Amendment protects against a warrantless entry into a home—including the curtilage associated with that home—without either an exigency justifying entry or consent to enter.

215. On October 24, 2025, the John Doe Defendants entered Feler's protected curtilage without a warrant to apprehend the workers who were renovating Feler's home.

216. The John Doe Defendants caused damage to Feler's possessions when they chased the workers through his curtilage.

217. No exigency justified the John Doe Defendants' warrantless entry.

218. Neither Feler nor anyone else with lawful authority to do so consented to the John Doe Defendants' warrantless entry.

219. By raiding, searching, and damaging Feler's property without a warrant, an exception to the warrant requirement, or Feler's consent, the John Doe Defendant officers violated the Fourth Amendment's command.

220. Because the John Doe Defendants were employees of the United States government, and because this tort action is brought for a violation of the Constitution of the United States, the individual officers are personally liable under the exception to the FTCA's exclusivity provision created by the Westfall Act of 1988. *See* 28 U.S.C. § 2679(b)(2)(A) (stating that the

remedy against the United States for torts by federal employees does not preclude other remedies in "a civil action against an employee of the Government . . . which is brought for a violation of the Constitution of the United States"); *Buchanan v. Barr*, 71 F.4th 1003, 1012–18 (D.C. Cir. 2023) (Walker, J., concurring).

221. Because the tortious conduct of the John Doe Defendants violated Feler's constitutional rights, Feler can state claims under state tort law, as that has been the traditional method of obtaining relief when federal employees' tortious acts violate the Constitution.

222. Alternatively, if the Westfall Act precludes Feler from bringing Count VI, and no other damages remedy is available in this case, then the Westfall Act is unconstitutional as applied to Feler. As a result, he may bring the trespass claims against the John Doe Defendant officers directly.

### Count VII: Westfall Act and Illinois Tort Law
### Trespass to Chattels
### *Against John Doe Defendants*

223. Feler realleges and incorporates the allegations in ¶¶ 1–155 of this complaint as if they are fully restated here.

224. In Illinois, "[a] trespass to a chattel may be committed by intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another." *Sotelo v. DirectRevenue, LLC*, 384 F. Supp. 2d 1219, 1229 (N.D. Ill. 2005) (citation omitted).

225. During the course of their unlawful search of Feler's protected curtilage on October 24, 2025, the John Doe Defendant officers unlawfully damaged Feler's property.

226. The October 24, 2025 raid was unlawful because it was conducted without a warrant, without Feler's consent, and without any applicable exception to the Fourth Amendment's warrant requirement.

227. As a direct result, Feler suffered the injuries listed above.

228. The tortious conduct of the John Doe Defendants also violated Feler's Fourth Amendment rights.

229. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

230. The Fourth Amendment protects against a warrantless entry into a home—including the curtilage associated with that home—without either an exigency justifying entry or consent to enter.

231. On October 24, 2025, the John Doe Defendants entered Feler's protected curtilage without a warrant to apprehend the workers who were renovating Feler's home.

232. The John Doe Defendants caused damage to Feler's possessions when they chased the workers through his curtilage.

233. No exigency justified the John Doe Defendants' warrantless entry.

234. Neither Feler nor anyone else with lawful authority to do so consented to the John Doe Defendants' warrantless entry.

235. By raiding, searching, and damaging Feler's property without a warrant, an exception to the warrant requirement, or Feler's consent, the John Doe Defendant officers violated the Fourth Amendment's command.

236. Because the John Doe Defendants were employees of the United States government, and because this tort action is brought for a violation of the Constitution of the United States, the individual officers are personally liable under the exception to the FTCA's exclusivity provision created by the Westfall Act of 1988. *See* 28 U.S.C. § 2679(b)(2)(A) (stating that the remedy against the United States for torts by federal employees does not preclude other remedies in "a civil action against an employee of the Government . . . which is brought for a violation of the Constitution of the United States"); *Buchanan v. Barr*, 71 F.4th 1003, 1012–18 (D.C. Cir. 2023) (Walker, J., concurring).

237. Because the tortious conduct of the John Doe Defendants violated Feler's constitutional rights, Feler can state claims under state tort law, as that has been the traditional method of obtaining relief when federal employees' tortious acts violate the Constitution.

238. Alternatively, if the Westfall Act precludes Feler from bringing Count VII, and no other damages remedy is available in this case, then the Westfall Act is unconstitutional as applied to Feler. As a result, he may bring the trespass to chattels claims against the John Doe Defendant officers directly.

**Count VIII: Westfall Act and Illinois Tort Law**
**Negligence**
*Against John Doe Defendants*

239. Feler realleges and incorporates the allegations in ¶¶ 1–155 of this complaint as if they are fully restated here.

240. In Illinois, "[t]he elements of a negligence cause of action are a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by the breach." *Johnson v. Armstrong*, 211 N.E.3d 355, 371 (Ill. 2022) (citation omitted).

33

241. The John Doe Defendant officers owed a duty to Feler to exercise reasonable care in ensuring that they would not errantly cause Feler's property to be searched and damaged as part of a warrantless law-enforcement raid conducted without probable cause.

242. The John Doe Defendant officers breached this duty by failing to take even basic steps to ensure that they would not search or damage Feler's property in an attempt to apprehend third parties who were not reasonably suspected of committing any crime.

243. As a direct result, Feler suffered the injuries listed above.

244. The tortious conduct of the John Doe Defendants also violated Feler's Fourth Amendment rights.

245. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

246. The Fourth Amendment protects against a warrantless entry into a home— including the curtilage associated with that home—without either an exigency justifying entry or consent to enter.

247. On October 24, 2025, the John Doe Defendants entered Feler's protected curtilage without a warrant to apprehend the workers who were renovating Feler's home.

248. The John Doe Defendants caused damage to Feler's possessions when they chased the workers through his curtilage.

249. No exigency justified the John Doe Defendants' warrantless entry.

250. Neither Feler nor anyone else with lawful authority to do so consented to the John Doe Defendants' warrantless entry.

251. By raiding, searching, and damaging Feler's property without a warrant, an exception to the warrant requirement, or Feler's consent, the John Doe Defendant officers violated the Fourth Amendment's command.

252. Because the John Doe Defendants were employees of the United States government, and because this tort action is brought for a violation of the Constitution of the United States, the individual officers are personally liable under the exception to the FTCA's exclusivity provision created by the Westfall Act of 1988. *See* 28 U.S.C. § 2679(b)(2)(A) (stating that the remedy against the United States for torts by federal employees does not preclude other remedies in "a civil action against an employee of the Government . . . which is brought for a violation of the Constitution of the United States"); *Buchanan v. Barr*, 71 F.4th 1003, 1012–18 (D.C. Cir. 2023) (Walker, J., concurring).

253. Because the tortious conduct of the John Doe Defendants violated Feler's constitutional rights, Feler can state claims under state tort law, as that has been the traditional method of obtaining relief when federal employees' tortious acts violate the Constitution.

254. Alternatively, if the Westfall Act precludes Feler from bringing Count VIII, and no other damages remedy is available in this case, then the Westfall Act is unconstitutional as applied to Feler. As a result, he may bring the negligence claims against the John Doe Defendant officers directly.

## REQUEST FOR RELIEF

Plaintiff respectfully requests relief as follows:

A. An award of nominal, compensatory, and punitive damages against all John Doe Defendant officers in their individual capacities for the unconstitutional entry of Feler's curtilage,

the unconstitutional damage to his property, and the unconstitutional searches of his property.

B.      An award of nominal and compensatory damages against the United States of America, for the negligent and/or wrongful acts and omissions of its employees while acting within the scope of their employment.

C.      A declaration that Feler's rights under the Fourth Amendment have been violated.

D.      An award of reasonable attorney's fees and costs against the United States. *See* 28 U.S.C. § 2412.

E.      All further legal and equitable relief as the Court deems just and proper.

Dated: July 28, 2026.                                    Respectfully submitted,

                                    /s/ Alasdair Whitney
                                    Alasdair Whitney (IL 6330628)
                                    Elizabeth Kregor (nee Milnikel) (IL 6272729)
                                    INSTITUTE FOR JUSTICE
                                    6020 S. University Ave.
                                    Chicago, IL 60637
                                    (773) 834-3129
                                    awhitney@ij.org
                                    bkregor@ij.org

                                    Dylan Moore (DC 90032175)*
                                    Patrick Jaicomo (MI P75705)*
                                    Anya Bidwell (TX 24101516)*
                                    INSTITUTE FOR JUSTICE
                                    901 N. Glebe Rd., Suite 900
                                    Arlington, VA 22203
                                    (703) 682-9320
                                    dmoore@ij.org
                                    pjaicomo@ij.org
                                    abidwell@ij.org
                                    *Pro hac vice motions to be filed

                                    Counsel for Plaintiff